# EXHIBIT B

**Calendar No. 312**

| | | |
|---|---|---|
| 108TH CONGRESS | | REPORT |
| *1st Session* | SENATE | 108–166 |

---

## AMENDING FAIR CREDIT REPORTING ACT

---

OCTOBER 17, 2003.—Ordered to be printed

---

Mr. SHELBY, from the Committee on Banking, Housing and Urban Affairs, submitted the following

# R E P O R T

[To accompany S. 1753]

The Committee on Banking, Housing, and Urban Affairs to which was referred the bill (S. 1753) to amend the Fair Credit Reporting Act in order to prevent identity theft, to improve the use of and consumer access to consumer reports, to enhance the accuracy of consumer reports, to limit the sharing of certain consumer information, to improve financial education and literacy, and for other purposes having considered the same, reports favorably thereon without amendment and recommends that the bill do pass.

On September 23, 2003 the Committee voted unanimously to report the bill to the Senate for consideration as promptly as circumstances permit.

### HEARING RECORD AND WITNESSES

On May 20, 2003, Mr. Howard Beales, Director, Bureau of Consumer Protection, Federal Trade Commission testified before the Committee to provide "An Overview of the Fair Credit Reporting Act."

On June 19, 2003, Mr. Howard Beales, Director, Bureau of Consumer Protection, Federal Trade Commission; Mr. Timothy Caddigan, Special Agent In-Charge, Criminal Investigation Division, United States Secret Service; Michael Cunningham, Senior Vice President, JP Morgan Chase Card Member Service; Captain John Harrison, U.S. Army—Ret.; Mr. Stuart Pratt, President and CEO, Consumer Data Industry Association; Ms. Linda Foley, Executive Director, Identity Theft Resource Center; Mr. William Hough, Vice President of Credit Services, The Neiman Marcus Group and Mr. Michael Naylor, Director of Advocacy, AARP appeared before

2

the Committee to testify on "The Growing Problem of Identity Theft and Its Relationship to the Fair Credit Reporting Act."

On June 26, 2003, Professor Joel Reidenberg, Professor of Law and Director of the Graduate Program, Fordham University; Mr. Ronald Prill, President, Target Financial Services; Mr. Terry Baloun, Regional President and Group Head, Wells Fargo Bank; Ms. Julie Brill, Assistant Attorney General, State of Vermont; Mr. Martin Wong, General Counsel, Global Consumer Group, Citigroup, Inc.; Mr. Edmund Mierzwinski, Consumer Program Director, U.S. Public Interest Research Group and Angela Maynard, Senior Vice President and Chief Privacy Executive, Key Bank appeared before the Committee to testify on "Affiliate Sharing Practices and Their Relationship to the Fair Credit Reporting Act."

On July 10, 2003, The Honorable Timothy Muris, Chairman, Federal Trade Commission; Mr. Stuart Pratt, President and CEO, Consumer Data Industry Association; Mr. Richard LeFebvre, President and Chief Executive Officer, AAA American Credit Bureau; Mr. Evan Hendricks, Editor, Privacy Times; Mr. Stephen Brobeck, Executive Director, Consumer Federation of America and Mr. David Jokinen, Consumer Witness, testified before the Committee on "The Accuracy of Credit Report Information and the Fair Credit Reporting Act."

On July 29, 2003, Ms. Delores Smith, Director, Division of Consumer and Community Affairs, Federal Reserve Board; Ms. Donna Gambrell, Deputy Director of Compliance & Consumer Protection, Federal Deposit Insurance Corporation; Mr. Joel Winston, Associate Director, Financial Practices Division, Bureau of Consumer Protection, Federal Trade Commission; Ms. Stacey Stewart, President and Chief Executive Officer, Fannie Mae Foundation; Mr. Scott Hildebrandt, Vice President of Direct Marketing Operations, Capital One Financial Corporation; Mr. Travis Plunkett, Consumer Federation of America and Ms. Cheri St. John, Vice President for Global Scoring Solutions, Fair Isaac Corporation testified before the Committee on "Consumer Awareness and Understanding of the Credit Granting Process."

On July 31, 2003, The Honorable John Snow, Secretary, Department of the Treasury; Mr. Edmund Mierzwinski, Consumer Program Director, U.S. Public Interest Research Group and Mr. Michael McEneney, Partner, Sidley Austin Brown & Wood LLP testified before the Committee on "Addressing Measures to Enhance the Operation of the Fair Credit Reporting Act."

### PURPOSE AND SUMMARY OF LEGISLATION

"The National Credit Reporting System Improvement Act of 2003" was developed after careful consideration of the operation of the credit markets, the credit reporting system and the law that regulates them, the Fair Credit Reporting Act ("FCRA" or "Act"). The legislation modifies the FCRA to address the significant changes which have occurred in the credit markets in the last seven years and contains measures which add greater flexibility so that the regulatory regime can evolve to adapt to further changes in the marketplace. Ultimately, this legislation addresses the needs of credit consumers while providing for the efficient operation of the national credit markets.

3

The legislation enhances the ability of consumers to combat identity theft, increases accuracy by providing consumers greater notice about, and access to, their credit report information, and allows consumers to exercise greater control regarding the type and amount of marketing solicitations they receive. Additionally, the bill restricts the use and transfer of sensitive medical information. Lastly, the legislation employs targeted measures to address the significant issue regarding the level of financial literacy in the United States.

The bill contains numerous measures which protect consumers from identity thieves. The legislation requires the truncation of credit and debit card account numbers on electronically printed receipts to prevent criminals from obtaining easy access to such key information. The bill directs the banking regulators, the National Credit Union Administration (NCUA) and the Federal Trade Commission (FTC) to develop identity theft "red flag" guidelines for use by the entities within their respective jurisdictions to help protect consumers. The legislation requires additional address verification efforts with respect to credit card account holders in certain circumstances where there is a probability of fraud. The bill requires the FTC to conduct a public campaign to increase consumer awareness of the methods available to prevent identity theft. Additionally, the legislation increases the punishment for individuals convicted of identity theft crimes.

The bill also includes provisions which address the needs of consumers who have been victims of identity theft. The legislation requires the FTC to prepare a summary of rights of identity theft victims that consumers can obtain from the national consumer reporting agencies. The bill allows victims who have obtained an identity theft report to block reporting of the trade lines associated with the identity theft activity and requires furnishers to takes steps to avoid re-reporting certain information to the credit bureaus when they know that it is identity theft-related. The legislation directs the national credit reporting agencies to coordinate and share consumer identity theft complaints with the other national agencies when a consumer makes a report to any one such agency. The legislation prohibits certain transfers of identity-theft related debts and requires debt collectors to provide identity theft victims with specific account information.

The legislation includes provisions that increase consumer access to, and control of, their credit report information. The bill provides consumers the right to make an annual request through a centralized system and receive, free of charge, copies of their credit reports from certain consumer reporting agencies. The legislation provides consumers the ability to request their credit scores or information about credit scores in certain contexts. The bill directs the FTC to develop a summary of consumer rights provided under the FCRA, including a description of how consumers can obtain credit reports and scores. The bill extends the effective period for a telephone prescreening "opt-out" from 2 years to 7 years and directs the FTC, the Federal Banking agencies and the NCUA to promulgate rules for the opt-out disclosures contained in solicitations involving the use of pre-screened lists. The legislation requires affiliated entities that use certain information to make certain solicitations for marketing purposes to provide consumers notice of such

4

uses and allow the consumer an opportunity to prohibit the solicitations.

The legislation contains numerous provisions to increase the accuracy of consumer reports by providing consumers greater notice about the content of their reports or by requiring regulators, credit bureaus and furnishers to place greater emphasis on the accuracy of the consumer report information. The legislation directs creditors to provide consumers notice when, because of the contents of the consumer's credit report, the creditor chooses to make a counter offer to the consumer on material terms that are materially less favorable than the terms generally available to the public. The bill directs the Federal banking regulators, the NCUA, and the FTC to develop guidelines for use by the entities under their respective jurisdictions to ensure greater accuracy and completeness of the information they furnish to the credit bureaus. The legislation requires the Federal Trade Commission and the Federal Reserve to conduct ongoing studies of the accuracy of consumer reports and the resolution of consumer complaint investigations. The bill requires credit bureaus and furnishers to take additional steps to rid consumer credit reports of inaccurate or incomplete information and to make sure consumer address information is accurate.

The legislation contains important new protections which significantly limit creditors' use of consumer medical information and restrict the dissemination of medical information in credit reports. These provisions also prohibit the sharing of medical information among affiliated entities and require the coding of medical information that is included in credit reports.

The legislation establishes the Financial Literacy and Education Commission (Commission). The Commission's primary duties are to undertake a review of the federal government's financial literacy programs, to coordinate promotion of federal financial literacy efforts, and to develop a national strategy on financial literacy and education. The Commission will be chaired by the Secretary of the Treasury and will hold hearings and receive testimony as necessary to fulfill the mandates of the Title. In addition, the Commission shall establish a website as a one-stop-shop connecting all of the federal literacy programs and establish a toll-free number so that those who do not have access to the internet may receive financial literacy information.

BACKGROUND AND NEED FOR LEGISLATION

*The Fair Credit Reporting Act*

Consumer credit markets in the United States have grown and changed dramatically over the course of the last fifty years. Where local banks and retailers once served as the primary source of credit for consumers, today, consumers can obtain credit from numerous entities located all over the country. Moreover, whereas obtaining credit once was once a labor and time-intensive process, today consumers can secure credit almost instantaneously.

The development of the current system, which makes more credit available, to a greater range of consumers, on a more timely basis is the result of the confluence of numerous factors. Innovations such as the securitization and sale of debt certainly increased the amount of capital available for consumer lending. Refinements to

5

the system for evaluating and pricing consumer credit significantly contributed to the advancement of the speed and efficiency in which the credit markets operate.

The FCRA, passed in 1970, spurred much of this development.

The FCRA contains the statutory framework governing consumer credit reporting. The law applies to information bearing on the qualifications and credit worthiness of consumers compiled by consumer reporting agencies and reported to third parties for use in evaluating consumer eligibility for credit, insurance and employment, for example. This information is transferred by way of what are commonly referred to as consumer reports. Consumer reports typically include such information as a consumer's name, address, social security number, telephone number, employment information, payment history, credit activity and other public record information such as legal judgments, including bankruptcies and arrests. For certain types of information, including bankruptcies and negative credit repayment history, the statute designates the length of time consumer reporting agencies can actively report such information.

Beyond consumer reporting agencies, the Act also regulates the activities of users of credit reports and furnishers of information to the reporting agencies. The FCRA strikes a balance between the privacy interests of consumers with respect to the contents of their credit reports and the need of businesses to access the information required to make accurate real time assessments of consumer qualifications. The Act states that credit reports may only be supplied to entities that have a statutorily designated "permissible purpose" to use the report. These permissible purposes include, among others, use in determining the consumer's eligibility for credit, insurance, and employment, or in connection with business transactions initiated by the consumer, as well as to determining consumer eligibility for "pre-screened" offers of credit and insurance (i.e. targeted marketing offers made to consumers who meet certain pre-established criteria). Consumer reporting agencies must take steps to ensure they provide reports solely to entities that have a permissible purpose for using the report. Furthermore, the Act contains criminal penalties for anyone who obtains a consumer report using false pretenses. The Act also requires users of consumer reports to notify consumers when, based on the contents of the report, they take certain adverse actions against the consumer.

Any entity that has relevant information about certain consumer activity may furnish that information to consumer reporting agencies. Because furnishing consumer report information is voluntary under the FCRA, entities that decide to furnish may decide, at any time, to cease furnishing. Furthermore, furnishers can select the particular consumer reporting agencies to whom they supply information. When entities do furnish information, however, the FCRA imposes duties on them with respect to the accuracy of the information they supply and to investigate consumer disputes.

*The 1996 Amendments*

In 1996, Congress significantly amended the FCRA. The driving force behind the changes was the significant amount of inaccurate information that was being reported by consumer reporting agencies and the difficulties that consumers faced getting such errors

6

corrected. In fact, during the period leading up to the amendments, the FTC consistently indicated that it received more complaints about consumer report errors than any other item. The accuracy related provisions included in the 1996 amendments imposed standards on furnishers, required completion of re-investigations within a specific time frame, and restricted the re-insertion of previously deleted materials.

Additionally, the authors of the 1996 Amendments sought to establish uniform standards in key areas in an effort to enhance the development of national credit markets. These measures include national standards for: the form and content of certain consumer disclosures, pre-screening activities; the procedures for consumers to dispute the accuracy of consumer reports; the duties of a person who take adverse action; the contents of consumer reports; furnisher responsibilities; and the sharing of information amongst affiliated entities. State laws with respect to these issues were preempted.

Because of the experimental nature of these provisions, however, the authors of the 1996 amendments specifically set forth that the preemptions would expire on January 1, 2004. The purpose of these sunsets was to prompt Congressional review of the impact of the 1996 amendments after such time that the full range of their effects on credit markets could be comprehensively evaluated.

*2003 Senate Banking Committee consideration*

In advance of the expiration of the preemption provisions, the Senate Committee on Banking, Housing and Urban Affairs conducted 6 hearings on the FCRA. These hearings covered a broad range of topics including: the overall accuracy of the contents of credit reports; the emergence and impact of identity theft on the credit granting and reporting systems; the level of consumer awareness and understanding of credit granting activity; and affiliate sharing practices. Beyond these particular hearing topics, the Committee had the opportunity to generally consider the effectiveness of the 1996 amendments as well as the overall state of the consumer credit markets and the consumer credit reporting system.

Through the course of the hearings the Committee was made aware of the vast size and scope of the consumer reporting system: Each of the national consumer reporting agencies maintain 200 million credit files. Approximately 30,000 data furnishers provide data to the national agencies as well as to the other regional agencies in the system. These furnishers report two billion updates to credit files every month. Lastly, over two billion credit files are purchased every year. Considering the huge proportions of the system, Stephen Brobeck, Executive Director of the Consumer Federation of American, testified that, in light of

> * * * the challenges it faces, our credit reporting system functions relatively well. These challenges include keeping track of billions of important changes in the credit histories of nearly 200 million Americans, in doing so when the furnishing of information by lenders is voluntary.

The logistical difficulties associated with the vast size and complexity of the consumer reporting system are necessarily confronted because of the tremendous significance of the purposes for which

7

the information is used. This information supports decision making with respect to trillions of dollars of consumer credit and insurance and millions of jobs. To this point, Mr. Brobeck further testified:

> Yet these challenges must be met because of the growing influence of this information and the related credit scores. Increasingly, these scores determine whether a consumer can purchase a mortgage loan, a consumer loan, auto insurance, homeowners insurance, a rental unit and utilities, and at what price; and increasingly, these scores influence whether Americans can obtain and retain a job.

These two critical factors informed the Committee's consideration of the FCRA: the practical importance of the system to the operation of the economy and the every day lives of millions of American consumers; and, the significant logistical issues associated with the sheer size and operation of a complex and dynamic system.

*Accuracy*

Achieving the accuracy in consumer report information was a main goal of the FCRA when it was enacted in 1970. Recognizing that inaccuracy retains the potential to be particularly unfair to any given consumer and to cause general inefficiencies in the operation of the credit markets, the Committee paid close attention to this issue in its deliberations. Indeed, witness testimony regarding the evolution of the credit markets provided indication that accuracy in credit report information matters more now than ever before. Mr. Howard Beales, the Director of the Bureau of Consumer Protection of the Federal Trade Commission, observed that:

> With growing frequency, the terms you are offered, whether it's the interest rate or the credit limit or some other aspect of the credit arrangement, depend on the risk that the individual borrower presents. And the higher the risk the worse the terms * * * Certainly in 1970, the information-processing technology and the information sharing technology simply wasn't in place to support that kind of system on any very large scale. Now it is. Now it is done. It's much more differentiated pricing of credit and insurance products based on the risks that a particular customer may pose.

Mr. Beales testimony provides an indication of the changes the use of "risk-based" pricing (i.e., pricing based on quantitative analysis of data related to credit worthiness) have brought to consumer reporting. Advancements in information technology and underwriting have moved credit markets far beyond the days where decisions with respect to eligibility were made on essentially a "pass-fail" basis. Today, instead of being told that he is qualified or not, a consumer's credit risk is carefully calculated so that he is offered a particular rate or terms that closely match the risks his report suggests he poses.

Because of the precision it affords creditors, risk-based pricing has made credit available to many more people. However, because the rates and terms are tied to the contents of credit reports, any

8

negative inaccuracy can have an impact on the price a consumer pays for credit.

Overall, the use of risk-based pricing provides numerous benefits to the economy and consumers. However, its use, which will only grow in the future, also underscores the need to ensure that consumer reports, on which such decisions are based, are as accurate as possible.

*Identity theft*

The Committee also paid considerable attention to major shifts or changes in the credit markets and the credit reporting landscape. Perhaps the most significant development since the passage of the 1996 amendments was the emergence and impact of identity theft. U.S. Secret Service Special Agent Timothy Caddigan told the Committee:

> The burgeoning use of the Internet and advanced technology, coupled with increased investment and expansion, has intensified competition within the financial sector. Although this provides benefit to the consumer through readily available credit and consumer-oriented financial services, it also creates a target-rich environment for today's sophisticated criminals, many of whom are organized and operate across international borders.

Millions of Americans have already been victimized by identity theft. Many have already dealt with what Special Agent Caddigan described as:

> the difficult, time consuming and potentially expensive task of repairing the damage that has been done to their credit, their savings, and their reputation.

Mr. Beales further elaborated that,

> in addition to harming consumers, ID theft also threatens the fair and efficient functioning of consumer credit markets. It undermines the accuracy and the credibility of the information flows that support those markets.

Due to the significant costs to consumers and to the economy, and because of the constant efforts of criminals to find new victims, it is vitally important to address measures which will help prevent identity theft and to punish identity thieves. Additionally, because so many will become victims despite the best efforts of businesses and law enforcement, it is also necessary to make it easier for identity theft victims to clean-up their credit history.

*Consumer financial literacy*

Another issue that the Committee focused on is the level of consumer awareness of the credit reporting and credit granting processes. Consumer awareness of how the system operates is very important because the FCRA assigns them significant responsibilities with respect to the content and control of their credit reports. Additionally, informed and knowledgeable consumers are best able to take advantage of new credit related products and services as well as to reduce the likelihood of their falling prey to identity thieves or predatory lenders.

9

Unfortunately, the information provided to the Committee on this issue was not very encouraging. Ms. Dolores Smith, Director, Division of Consumer and Community Affairs, Federal Reserve Board appeared before the Committee and commented:

> As the financial services industry has grown larger, financial products and services more complex, and the U.S. population more mobile, it is no longer feasible for institutions to evaluate the credit standing of consumers based solely on their direct experiences with consumers. Centralized consumer reporting agencies have evolved to provide a repository of credit history information that can be accessed by creditors to evaluate prospective borrowers. * * * The national credit reporting system has become invaluable to creditors for assessing consumers' creditworthiness. Thus, it is crucial that consumers understand how this system operates and how it impacts access to credit. Educated consumers who make informed decisions about credit are essential to an efficient, effective marketplace.

However, Mr. Joel Winston, Associate Director, Financial Practices Division, Bureau of Consumer Protection Issues, Federal Trade Commission indicated that:

> The Commission has a great deal of experience through its law enforcement and education activities in assessing the level of consumer knowledge in this area. Unfortunately, what we have observed is consistent with the Consumer Federation study that came out yesterday; that is many consumers have limited knowledge of how our credit system works.

Due to the considerable importance of consumer financial literacy and what appears to be a general lack of it, action is necessary to address this issue.

*Information use practices*

The FCRA contains specific standards for the collection, transfer and use of certain kinds of sensitive information relating to consumers. These standards do not apply, or only apply in limited fashion, however, in certain circumstances where affiliated businesses engage in the collection, transfer and use of consumer data within the affiliated structure. In light of this fact and because of the considerable changes which now allow financial services firms to operate using larger and much more complex corporate structures in more varied lines of business, and greatly increased public concern about privacy and the control of sensitive financial information, the Committee conducted the only hearing it has ever held on this subject.

This hearing focused on the types of affiliate structures in use today, the kinds of information being shared and the purposes for which it is being shared. Additionally, consideration was given to the level of consumer understanding regarding these sharing practices, including their recognition of the range of entities that share information, the nature of their concerns about such sharing, and the existence of the choices they have regarding controlling it.

10

The Committee learned of a broad range of purposes for sharing consumer information. These included fraud detection and deterrence, internal credit risk evaluation, product development, and customer servicing. The Committee also learned that information was shared for various marketing purposes.

Overall, the information furnished to the Committee provided a general overview with respect to information sharing practices. Professor Joel Reidenberg testified that more than a cursory examination of information sharing was actually necessary:

(What is needed) is to investigate the actual sharing practices of credit report information among affiliated companies, and the specific uses of that data by affiliated recipients that escapes the protection. To that end, I think Congress should instruct the functional bank regulators and the Federal Trade Commission to investigate, audit and report back exactly how organizations are using it.

Furthermore, the Committee learned that consumers generally have a vague understanding and only a limited appreciation of, or erroneous expectations about, the manner in which their information is used and the entities that are using it. On this point, Vermont Assistant Attorney General Julie Brill indicated:

It is quite simply the case that consumers do not expect that their Citibank account number will be shared with Travelers or a Citibank affiliate for marketing purposes. We believe that consumers should be notified with respect to this kind of affiliate sharing of information when it is being used for marketing purposes.

There are many information sharing activities that fall outside the scope of the FCRA. These practices are conducted for a broad range of purposes. Currently, there is not significant consumer awareness or understanding with respect to these activities. It is very important to obtain a greater understanding of such activities and to provide consumers with greater awareness of and control over certain uses of their financial information.

*National Standards*

One of the stated purposes of the 1996 amendments was to spur further development of the national credit markets. To this end, the 1996 amendments contained various provisions which set forth uniform, national standards. Numerous witnesses commented on the seminal importance of these standards for economic development, including Secretary of the Treasury Snow, who noted:

It is important to understand that these uniform national standards * * * operate in a very fundamental way to expand the opportunity for consumers to get access to credit and a broad range of financial services. What they really do is allow you to take your reputation with you as you travel around the country. America is a mobile society. Something like one-sixth of American families move in a given year. As you move, you leave the place you are known, you move to another State, another city. You can [still] get credit. You can buy a house. You can buy an automobile. You can go into a store and easily get credit

11

because your reputation follows you around and you do not have to start from scratch, and that is critically important in a mobile society like the one we have in the United States.

One significant concern expressed about the national standards contained in the FCRA is the fact that they preclude states from adopting more robust consumer protections. Furthermore, many witnesses expressed the perspective that without state activity, the law would not appropriately evolve to meet changes occurring in the marketplace.

National credit markets are necessary to meet business and consumer demands and are very important to the efficient operation of the United States economy. There is also a significant need to provide consumer protections which can evolve to meet changing circumstances.

SECTION-BY-SECTION ANALYSIS

*Section 1. Short title*

This section establishes the title of the bill, the "National Consumer Credit Reporting System Improvement Act of 2003" and provides a table of contents.

*Section 111. Definitions*

This section adds new terms to Section 603 of the FCRA including, "active duty military consumer," "fraud alert," "active duty alert," "creditor," "credit card," "debit card," "account and electronic fund transfer," "Federal banking agencies," "financial institution," "reseller," "credit scores," "dwelling," and "identity theft report."

For the purpose of achieving uniformity and clarity, the Committee sought to cross reference preexisting definitions from other sources in the United States Code.

TITLE I—IDENTITY THEFT PREVENTION AND CREDIT HISTORY RESTORATION

Subtitle A—Identity Theft Prevention

*Section 112. Fraud alerts and active duty alerts*

This section adds a new Section 605A to the FCRA. This provision designates 3 different circumstances where consumers and/or military personnel can direct the national consumer reporting agencies (as defined in section 603(p) of the FCRA) to attach a fraud alert or an active duty alert to their consumer reports. A fraud or active duty alert is a statement that notifies users of the report that the particular consumer could be a victim of fraud or is an active duty member of the military and requires such users to take specific steps to obtain authorization from the consumer before establishing new credit or increasing a credit limit in the name of a consumer that has placed an alert in his file. This provision is specifically intended to limit the opportunity of criminals to take advantage of consumers in situations involving the use of credit reports. Thus, it applies only to situations where a credit report is being pulled for the purpose of providing new credit or increasing the amount of currently available credit.

12

In the first circumstance, upon the request of a consumer who asserts in good faith that he or she has been or is about to become a victim of fraud or related crime, a national consumer reporting agency that maintains a file on the consumer and has received appropriate proof of the identity of the requester shall include a fraud alert in the consumer's file for at least 90 days, unless the consumer otherwise requests that the alert be removed before that period expires. It is the Committee's view that the 90 day alert provides consumers a ready means to protect themselves in situations where they have concerns without overly burdening the credit reporting system.

In the second circumstance, upon request of a consumer who submits an identity theft report to a national consumer reporting agency that maintains a file on the consumer and has received appropriate proof of the identity of the requester, the consumer reporting agency shall include a fraud alert in the file of that consumer during the 7 year period beginning on the date of the request, unless the consumer otherwise requests that the alert be removed before that period expires. An identity theft report is a report alleging identity theft, that has been filed with an appropriate law enforcement or local government agency, that subjects the person filing the report to criminal penalties if, in fact, the information in the report is false. Additionally, consumer reporting agencies shall also accept, in lieu of an identity theft report a copy of a standardized identity theft affidavit as made available by the Federal Trade Commission or any affidavit of fact that is acceptable to the consumer reporting agency.

Consumers who have made requests under this section are also removed from any lists used to make prescreened offers of credit or insurance. Unless the consumer otherwise designates, the consumer's exclusion from such lists is effective for seven years. This section also requires the national consumer reporting agencies to disclose to consumers making requests for extended fraud alerts their right to request two free copies of their credit report during the 12-month period beginning on the date the extended fraud alert was inserted into the consumer's file. The Committee provided extended, or 7 year alerts, to deal with situations where consumers have firmly established that they have been victimized and want to take measures to reduce the likelihood that further damage can be done by an identity thief.

In the third and final circumstance, upon the request of active duty members of the military, national consumer reporting agencies shall include an active duty alert in the file of the active military consumer for at least a year. Additionally, except as where otherwise provided by the active duty military consumer, such consumers who place alerts in their files under this section are excluded from eligibility for prescreened offers of credit or insurance for a year.

Under each of the preceding circumstances, any national consumer reporting agency that receives an alert request from a consumer must pass along that alert request to the other national consumer reporting agencies, who must then act to include alerts in any files they may maintain on that consumer. This section requires resellers of consumer reports to convey alerts in any file or report they prepare. Additionally this section requires consumer re-

13

porting agencies that do not fall into the category of "national" consumer reporting agencies to provide to consumers expressing a concern with respect to fraud or other related crime the contact information of the Federal Trade Commission and the national credit reporting agencies.

### Section 113. Truncation of credit card and debit card account numbers

This section amends Section 605 of the FCRA to require businesses that accept credit or debit cards to truncate the card account numbers or the expiration dates on any electronically printed receipts. This section provides for a 3 year effective date for any cash registers in use on or before January 1, 2005 and a 1 year effective date for any register put into use after January 1, 2005. The Committee included this provision to limit the number of opportunities for identity thieves to "pick off" key card account information. The phase in periods are designed to give merchants a reasonable opportunity to come into compliance with this section.

### Section 114. Establishment of procedures for the identification of possible instances of identity theft

This section amends Section 615 of the FCRA by requiring the Federal banking agencies, the National Credit Union Administration and the Federal Trade Commission to develop guidelines and prescribe regulations in coordination for use by banks, credit unions, and other creditors for the purpose of identifying and preventing identity theft related risks to consumers.

The Committee intends for the guidelines to provide flexibility to institutions given the changing nature of identity theft and related crimes. The Committee expects that the guidelines adopted under this provision will be risk-based and will vary based on a number of factors, including the size and sophistication of the institution. The Committee does not believe that a "one size fits all" approach is appropriate—the guidelines should be a general outline for use by financial institutions, creditors, and other users of consumer reports.

The Federal banking agencies, the National Credit Union Administration, and the Federal Trade Commission must prescribe regulations requiring each financial institution and any other person that is a creditor or other user of a consumer report to establish reasonable policies and procedures for implementing the guidelines described above to identify possible risks to account holders or customers, or to the safety and soundness of the institution. Although institutions and others must establish reasonable policies and procedures to identify possible risks to customer accounts, the Committee again notes that such policies and procedures will vary from institution to institution. The Committee believes that the Federal banking agencies, the National Credit Union Administration, and the Federal Trade Commission are equipped to establish broad parameters for such guidelines, but that individual institutions are in the best position to determine how best to develop and implement the required policies and procedures. The Committee also notes that many institutions already must have such policies and procedures for purposes of consumers establishing new accounts as a result of Section 326 of the USA PATRIOT Act.

14

Section 114 also directs the Federal banking agencies, the National Credit Union Administration, and the Federal Trade Commission to prescribe regulations applicable to credit and debit card issuers to ensure that each card issuer follows reasonable policies and procedures that prohibit, as appropriate, the card issuer from issuing an additional or replacement card if the card issuer receives the request for the additional or replacement card for an existing account within 30 days after the card issuer has received notification of a change of address for the same account. Because the nature of identity theft and credit card fraud continues to evolve, the Committee believes that identity theft prevention measures, such as those required under Section 615(f) of the FCRA, must be flexible so that they can be modified as the criminals alter their schemes. The Committee does not believe that it would be necessary for a card issuer to take additional steps as a result of Section 114 if, despite receiving a request for an address change, the issuer did not actually change the cardholder's address for any reason (e.g. the card issuer had previously determined that the request for an address change was invalid).

Card issuers are provided flexibility in formulating the policies and procedures required to comply with Section 114. Specifically, Section 114 provides three alternative formulations the card issuer could use in order to provide the cardholder with the additional or replacement card if the request for such a card comes within 30 days after a change of address. Under the first alternative, the issuer could notify the cardholder of the request for an additional or replacement card at the cardholder's former address and provide the cardholder a means of promptly reporting incorrect address changes. Such a means of reporting an incorrect change could be through the mail, by telephone, or electronically. Under the second alternative, the card issuer could notify the cardholder of the request for additional or replacement cards by other means of communication to which the cardholder and the card issuer previously agreed. Section 114 provides a third alternative that allows a card issuer to assess the validity of the change of address request in accordance with reasonable policies and procedures established by the card issuer pursuant to regulations prescribed by the Federal banking agencies, the National Credit Union Administration, and the Federal Trade Commission under Section 615(e) of the FCRA (as added by Section 114). The Committee strongly believes that the reasonableness of each issuer's policies and procedures will depend on a number of factors, including the issuer's risk assessment of the cardholder's request and the issuer's resources and sophistication. The Committee does not expect for there to be an "industry standard" with respect to such policies and procedures. However, the Committee believes that an issuer may rely on authentication procedures that do not involve a separate communication with the cardholder so long as the issuer has reasonably assessed the validity of the address change.

*Section 115. Enhancement of identity theft penalties and prohibitions*

This section makes possession of a false identification a punishable offense and increases the maximum penalty for an identity theft offense from 3 to 5 years in prison. It is the Committee's view

15

that identity theft is a serious crime that should result in significant punishment for the perpetrator.

### Subtitle B—Protection and Restoration of Identity Theft Victim Credit History

*Section 151. Summary of rights of identity theft victims*

This section amends Section 609 of the FCRA to require the Federal Trade Commission to develop, in consultation with the Federal banking agencies and the National Credit Union Administration, a model summary of rights for consumers with respect to the procedures for remedying the effects of fraud or identity theft involving credit, electronic fund transfers or accounts or transactions at or with a financial institution. This section requires consumer reporting agencies to provide consumers a copy of the model summary prepared by the Commission. Additionally, this section requires the Federal Trade Commission to develop and implement a media campaign to provide more information to the public on ways to prevent identity theft. The Committee included these requirements in an effort to provide the public with more information on measures they can take to prevent identity theft. By requiring the development of the summary of rights, it is the Committee's intention to provide victims with easy access to reliable information regarding the steps they should take to deal with identity theft.

*Section 152. Blocking of information relating to identity theft*

This section adds a new Section 605B to the FCRA which allows consumers who allege they have been victims of identity theft to direct consumer reporting agencies to block the reporting of information relating to accounts associated with alleged identity theft activity. Consumers are required to provide to the consumer reporting agency appropriate proof of their identity, a copy of an identity theft report, and information which identifies the particular information that is to be blocked in the consumer's file. An identity theft report is a report alleging identity theft, that has been filed with an appropriate law enforcement or local government agency, that subjects the person filing the report to criminal penalties if, in fact, the information in the report is false. Additionally, this section requires consumer reporting agencies to notify the furnisher of the information that: the information may be a result of identity theft, that the consumer has filed an identity theft report, and that a block has been requested. This section does allow consumer reporting agencies to choose to decline or rescind the block if they determine that the consumer made the request in error, misrepresented facts relevant to the block or actually received the goods, services or money as a result of the blocked transaction. If a block is declined or rescinded, the consumer reporting agency must quickly notify the consumer.

Certain exceptions are provided for consumer report resellers and check servicing companies. Resellers not otherwise furnishing or reselling consumer reports containing information identified by the consumer need only inform the consumer that he or she report the identity theft to the Commission. Resellers with files containing the information shall block such information where the consumer has otherwise complied with the requirements of this section (i.e., the

16

consumer has provided appropriate proof of their identity, a copy of an identity theft report, and information which identifies the particular information that is to be blocked in the consumer's file). Check servicing companies do not have to comply with this section except that, beginning three business days after receipt of the information consumers are required to provide to obtain a block, such companies shall not furnish to national consumer reporting agencies any information provided in the identity theft report provided by the consumer.

This section should not be construed to require consumer reporting agencies to withhold consumer file information from law enforcement agencies when such agencies could otherwise obtain such information.

*Section 153. Coordination of identity theft complaint investigations*

This section amends Section 621 of the FCRA by requiring the national credit reporting agencies (as defined in Section 603(p) of the Act) to develop and maintain procedures for the referral to each other national credit reporting agency of any consumer complaint alleging identity theft or requesting a fraud alert. This section also requires each of the consumer reporting agencies to submit an annual summary to the Federal Trade Commission with respect to the consumer complaints the agency receives on identity theft or fraud alerts.

*Section 154. Prevention of repollution of consumer reports*

This section amends Section 623 of the FCRA to require furnishers to have reasonable procedures in place to prevent refurnishing information when they have been notified by a consumer reporting agency that such information had been identified as being associated with identity theft and was being blocked by the agency from being reported. This section also amends Section 623 of the FCRA to require furnishers to conduct investigations of identity theft-related disputes raised directly with them by consumers. These obligations are only triggered in instances where consumers provide them with an identity theft report or a copy of a standardized identity theft affidavit. Lastly, subject to certain exceptions, this section amends Section 615 of the FCRA to prohibit entities that have received notice that a particular debt may be identity theft-related from selling or transferring such debt. The prohibtions of this section apply to all persons collecting a debt after the date of notification. The exceptions include transfers or sales involving: the repurchase of debt in situations where the assignee of the debt requires such repurchase because the debt resulted from identity theft; the securitization of a debt; or the transfer of a debt as a result of a merger, acquisition, purchase and assumption transaction, or transfer of substantially all of the assets of an entity. The Committee included these provisions to help consumers who have been victimized by identity theft to more easily "clean-up" the damage they have sustained.

*Section 155. Notice by debt collectors with respect to fraudulent information*

This section adds to Section 615 of the FCRA the requirement that debt collectors, when acting on behalf of a third party and

when notified that the debt they are attempting to collect may be the result of fraud or identity theft, must notify the third party of the possible fraud or identity theft. This section also requires the debt collector to provide information relating to the debt to the consumer alleging the identity theft.

### Section 156. Statute of limitations

This section amends Section 618 of the FCRA to extend the statute of limitations for violations of the Act. This section requires claims to be brought within 2 years of the discovery of the violation and with an outside restriction that all claims must be brought within 7 years of when the violation occurred.

### TITLE II—IMPROVEMENTS IN USE OF CONSUMER ACCESS TO CREDIT INFORMATION

### Section 211. Free credit reports

This section amends Sections 612 of the FCRA to allow consumers to receive a free consumer report annually from the national credit reporting agencies through a centralized system established by Federal Trade Commission rule making. The centralized system shall allow consumers to obtain free reports from all three agencies using a single request. In light of the logistics and cost associated with providing the reports, the Committee provided that requests for such reports could be made only by mail or the Internet in such fashion that the consumer requests would be staggered so that they all would not occur at once. The Committee provided rule making authority to stagger consumer requests for free reports. Additionally, the Committee extended the time the national consumer reporting agencies have to provide reports requested under this section to 15 days and extended the period for reinvestigation of any disputes raised by consumers receiving free reports to 45 days. Requests for free reports may still be made by telephone as provided under current law if the consumer: has received an adverse action notice; believes his or her file is inaccurate due to fraud; is unemployed and seeking employment; or is a public welfare recipient.

This section also amends Section 609(c) of the FCRA to require the Federal Trade Commission to prepare a summary of the rights of consumers as provided by the FCRA. This summary shall include a description of: the right of a consumer to obtain a free credit report and the method to obtain it; the right of a consumer to dispute information contained in his file; and the right of a consumer to obtain a credit score and a description of how to obtain a credit score. Additionally, this section requires the Federal Trade Commission to actively publicize the summary of rights made available by this section and the consumer's right to a free report and a credit score and the manner in which such free report and score may be obtained.

### Section 212. Credit scores

This section amends Section 609 of the FCRA to require consumer reporting agencies to disclose, upon consumer request and, in connection with an application for an extension of consumer credit secured by a dwelling, specific consumer credit scoring infor-

18

mation including a credit score: (1) Derived from a model widely distributed to users of credit scores; or (2) that assists the consumer in understanding the credit scoring assessment of the consumer's credit behavior and predictions about future credit behavior.

This section also amends Section 615 of the FCRA to require any person that makes or arranges extensions of consumer credit that are to be secured by a dwelling, and that uses credit scores for that purpose, to provide the consumer with a copy of: (1) The information obtained from a consumer reporting agency or that was developed and used by that user of the credit score information; or (2) a copy of the information provided to the user by a third party that developed the credit score, plus a general description of credit scores, their use, and the sources and kinds of data used to generate credit scores. This section also declares void any contract provision that prohibits such mandated disclosures and exempts from contractual liability any user of a credit score for making such a disclosure.

*Section 213. Enhanced disclosure of the means available to opt out of prescreened lists*

This section amends Sections 615(d)(2) and 604(e) of the FCRA and directs the Federal Trade Commission, in consultation with the federal banking agencies and the NCUA to promulgate rules with respect to the contents of solicitations generated from the use of "pre-screened" lists. Currently, the FCRA imposes certain pre-screening disclosure obligations. This section directs the Commission to modify the format of these disclosures. The Committee intends for the Federal Trade Commission to establish reasonable format and type size requirements so that the disclosure is presented in a manner and location that will make consumers aware of the opportunity and method to opt-out. This section extends the effective period of a telephone opt-out from 2 to 7 years. This section also requires the Federal Trade Commission to actively publicize the availability of the pre-screening opt-out and the manner in which a consumer can execute an opt-out selection, including requiring the Commission to post such information on its website.

*Section 214. Affiliate sharing*

This section creates a new Section 624 and requires the Federal banking agencies, the National Credit Union Administration and the Federal Trade Commission to prescribe regulations to establish special rules for solicitation for purposes of marketing. The Committee expects the Federal banking agencies, the National Credit Union Administration, and the Federal Trade Commission to prescribe regulations under Section 624 of the FCRA applicable to entities within each such agency's respective jurisdiction. The Committee expects such agencies to coordinate their regulations to ensure consistency, as appropriate. The regulations must ensure that the notices provided include a simple means to opt out under Section 624 of the FCRA. The Committee intends for notice and opt out required under Section 624 of the FCRA to be consistent with the current notice and opt out provided under Section 603(d)(2)(A)(iii). Therefore, the Committee specifically directs the agencies to consider the affiliate sharing notification practices em-

19

ployed on the date of enactment of this Act by persons that will be subject to Section 624 of the FCRA.

This section sets forth that any person that receives from another person related to it by common ownership or affiliated by corporate control a communication of information that would be a consumer report, except for clauses (i) through (iii) of section 603(d)(2)(A), may not use the information to make a solicitation for marketing purposes without complying with the section's notice and opt-out requirements. The notice requirements mandate that it must be clearly and conspicuously disclosed so the information may be communicated among such persons for the purposes of making solicitations to the consumer. The opt-out provision requires that the consumer be provided an opportunity and simple method to prohibit the making of such solicitations by such person. If a consumer makes an election to prohibit the sending of solicitations, such election shall be effective for five years. At such time the election is no longer effective, a person using the kinds of information in the manner covered by this section must provide notice and opportunity to opt-out again in order to use the information to make solicitations for marketing purposes.

Four particular situations are excluded from the scope of this provision: (1) A person using information to make a solicitation for marketing purposes to a consumer with whom the person has a pre-existing business relationship; (2) a person using information to perform services on behalf of another person related by common ownership or affiliated by corporate control, except that such a person can not send solicitations on behalf of another person who would not otherwise be permitted to send solicitations; (3) a person using information in direct response to a communication initiated by the consumer in which the consumer has requested information about a product or service; or (4) a person using information to directly respond to solicitations authorized or requested by the consumer.

The Committee has declined to specify how the notice required under Section 624 of the FCRA is provided to the consumer. However, the required notice may be provided to a consumer together with disclosures required by any other provision of law.

This section is intended to provide consumers notice and choices with respect to instances where entities they do not have relationships with gather information from the entities they do have relationships with and use such information to send solicitations for marketing purposes. This section is not intended to limit the solicitations for marketing purposes of persons or entities with whom consumers have pre-existing business relationships, nor is it intended to restrict contact with consumers in situations where the consumers themselves are requesting information or service.

This section also requires the Federal banking agencies, the National Credit Union Administration and the FTC to study the information sharing practices of affiliated creditors to determine: the specific purposes of information sharing; the specific types of information being shared; the availability of consumer choices with respect to control of such sharing; and the impact sharing has on the rights consumers are provided under the FCRA. The agencies are required to make an initial report of their findings to Congress and then follow-up such report every three years with further studies

20

which identify and examine the effects of any changes in information sharing practices.

*Section 215. Study of the effects of credit scores and credit-based insurance scores on availability and affordability of financial products*

This section requires the Federal Trade Commission to study the use of credit scores and credit-based insurance scores on the availability and affordability of financial products; the degree of correlation between the factors considered by credit score systems and the quantifiable risks and actual losses experienced by businesses; the extent to which the use of scoring models, credit scores, and credit-based insurance scores benefit or negatively impact persons based on geography, income, ethnicity, race, color, religion, age, marital status or creed; and the extent to which scoring systems are used by businesses, the factors considered by such systems and the effects of variables which are not considered by such systems. In conducting this study, the Commission is directed to obtain public input. The Commission is required to submit the detailed report to Congress containing its findings, conclusions, and recommendations.

## TITLE III—ENHANCING THE ACCURACY OF CONSUMER REPORT INFORMATION

*Section 311. Notice with respect to counteroffers*

This section amends Section 603(k) of the FCRA to require the Secretary of the Treasury, the Federal Reserve, and the Federal Trade Commission to promulgate rules requiring that a consumer who receives a grant of credit, based on a counter offer by the creditor on material terms, including interest, that are materially less favorable than the terms generally made available to consumers, receives a notice that indicates such terms were based on the contents of the consumer's credit report. It is the view of the Committee that "material term" may include, but is not limited to: interest rate, advanced deposit or prepayment requirements, points, fees, and prepayment penalties.

This section is intended to address the frequently occurring situation where creditors review consumers' credit reports and make risk-based adjustments to the credit terms they offer the consumer. Under current law, a consumer is only provided an adverse action notice when the consumer does not qualify for credit or rejects a counteroffer made by a creditor. The Committee record indicates that despite the many benefits of risk-based pricing, it has made the current adverse action notification construct obsolete in certain circumstances. This is problematic in as much as the adverse action notice is the primary tool the FCRA contains to ensure that mistakes in credit reports are discovered. This section requires that consumers be given notice in situations where they have accepted terms made by way of a counter offer but such terms are materially less favorable then terms generally available and their credit report was used to make the decision to provide them such terms. The Committee believes that consumers should receive these notices when information in a credit report leads to a change in terms that significantly impacts the cost of the credit offer. It is not the

21

Committee's intent that every consumer receive a notice for every term change that occurs.

*Section 312. Procedures to enhance the accuracy and completeness of information furnished to consumer reporting agencies*

This section amends Section 623 of the FCRA to require the Federal banking agencies, the National Credit Union Administration and the Federal Trade Commission to develop guidelines and promulgate regulations with respect to the accuracy and completeness of the information furnished to credit reporting agencies. The Committee believes that the reporting system benefits creditors and consumers to the maximum extent possible when furnishers do not withhold information, such as credit limits, to block their client base from receiving competitive offers from other creditors.

These guidelines are to be updated as necessary to keep the best standards in place for the credit reporting system. It is the intention of the Committee that enforcement of the provisions required under this section shall be conducted solely by the Federal regulators. Enforcement jurisdiction for the various different types of furnishing entities shall comply with the jurisdiction provision set forth under Section 621 of the Act. The Committee intends these guidelines to be flexible, as they will apply to entities of all sizes and levels of sophistication. The Committee also recognizes that the information furnished voluntarily to consumer reporting agencies is essential and therefore these guidelines should reflect the need to have accurate and complete information reported without creating meaningful disincentives for furnishing information to consumer reporting agencies.

The Committee recognizes that there are both legal and practical reasons for not requiring the reporting of information in specific situations. For example, the Fair Credit Billing Act currently prohibits disclosure of information during the pendancy of a dispute. There are also other situations where the institution would choose not to report negative information about a consumer as a courtesy to the consumer, such as where the information may not bear directly on the creditworthiness of the consumer but where such reporting would trigger consumer concern. The Committee recognizes that these and other specific situations may warrant being excluded from any regulatory approach taken pursuant to this section.

This section also amends Section 623(a)(5) of the Act to provide that a person that notifies a consumer reporting agency with respect to information pertaining to a delinquent account may rely on the date provided by the entity to whom the account was owed at the time that the delinquency occurred, provided a consumer has not disputed such information.

*Section 313. Federal Trade Commission and consumer reporting agency action concerning complaints*

This section amends Section 611 of the FCRA by requiring the Federal Trade Commission to compile all complaints regarding incomplete or inaccurate credit report information and to transmit all such complaints to each consumer reporting agency involved. The national consumer reporting agencies (as defined by Section 603(p) of the Act) are required to keep track of the complaint referrals re-

22

ceived from the Commission and regularly report to the Commission the determinations taken with respect to the disposition of such consumer complaint cases.

*Section 314. Ongoing audits of the accuracy of consumer reports*

This section requires the Federal Reserve to study the contents of the credit reports produced by the national credit reporting agencies and to determine the accuracy and completeness of such reports and the relationship the contents of such reports have on the credit eligibility of consumers.

*Section 315. Improved disclosure of the results of reinvestigation*

This section amends Sections 611 and 623 of the FCRA. It requires consumer reporting agencies, upon completion of a reinvestigation where information was determined to be inaccurate, incomplete, or unverified, to notify the furnisher of that information that such information was deleted. This section also requires furnishers, upon completion of a reinvestigation, to modify the records furnished to the consumer reporting agencies as is necessary and appropriate to reflect the findings of the investigation.

*Section 316. Reconciling addresses*

This section amends Section 605 of the FCRA to require consumer reporting agencies to provide users of consumer reports notice when the consumer address contained in the report differs substantially from the address provided by the user when it requested the report. This section further requires the Federal banking agencies, the NCUA and the FTC to promulgate regulations to require users of consumer reports to take measures to ensure the accuracy of the consumer addresses they are using.

*Section 317. FTC study of issues relating to the Fair Credit Reporting Act*

This section requires the Federal Trade Commission to study and provide a report regarding the effects that the use of partial matching information by credit reporting agencies has on the accuracy of credit reports and to consider the costs and benefits to consumers associated with the use of additional points of identifying information. The section requires the Commission to study and provide a report regarding the impact of providing independent notification to consumers when negative information is included in their credit reports and to consider the effects of requiring that consumers who experience adverse actions receive a copy of the same credit report used by the lender in taking the adverse action. This section also requires the Commission to consider common financial transactions that are not currently reported to consumer reporting agencies that might bear on creditworthiness, and possible actions to encourage the reporting of such transactions within a voluntary system.

TITLE IV—LIMITS ON SHARING OF MEDICAL INFORMATION

*Section 411. Protection of Medical Information in the Financial System*

This section amends Section 604(g) of the Act to prohibit a consumer reporting agency from furnishing a consumer report that

23

contains medical information in connection with an insurance transaction unless the consumer affirmatively consents (opts-in) to the furnishing of the report. A report containing medical information may only be furnished for employment purposes or in connection with a credit transaction if the information to be furnished is relevant to, or affects, the employment or credit transaction, and the consumer provides specific written consent for the furnishing of the report that describes in clear and conspicuous language the use for which the information will be furnished. Alternatively, such information can be reported if it is restricted or reported using codes that do not identify, or provide information sufficient to infer, the specific provider or nature of such services, products or devices to a person other than to the consumer, unless the information is being provided for a purpose relating to the business of insurance other than property or casualty insurance. This section also prohibits creditors from obtaining or using medical information pertaining to a consumer in connection with any determination of the consumer's eligibility or continued eligibility for credit.

This section also restricts any person who receives medical information by way of the exceptions from disclosing such information to any other person except as necessary to carry out the purpose for which it was originally disclosed.

This section also prohibits the sharing of medical information among affiliates, including the sharing of an individualized list or description based on a consumer's payment transactions for medical products or services, or an aggregate list of consumers based on payment transactions for medical products or services.

*412. Confidentiality of medical contact information in consumer reports*

This section amends Section 623 (a) of the FCRA to require furnishers whose primary business is providing medical services, products, or devices to notify the consumer reporting agencies of their status as a medical information furnisher for purposes of compliance with the medical information coding requirements.

### TITLE V—FINANCIAL LITERACY AND EDUCATION IMPROVEMENT ACT

*Section 511. Short title*

This section establishes the short title of "Financial Literacy and Education Improvement Act."

*Section 512. Definitions*

This section establishes two definitions in the Title for "Chairperson" and "Commission."

*Section 513. Establishment of Financial Literacy and Education Commission*

This section establishes the Financial Literacy and Education Commission with the Secretary of the Treasury as the Chairperson. The section sets forth the membership of the Commission to include federal agencies with significant financial literacy programs and authorizes the President to designate five additional members.

24

The Commission shall meet at least once every four months. The initial meeting shall be not later than 60 days after enactment.

*Section 514. Duties of the Commission*

In general, this section sets forth the duties of the Commission to review financial literacy and education efforts throughout the federal government; to identify and eliminate duplicative federal financial literacy efforts; to coordinate the promotion of federal financial literacy efforts including outreach between federal, state and local governments, non-profit organizations and private enterprises; to develop within eighteen months a national strategy to promote financial literacy and education among all Americans; to implement the strategy; and to submit an annual report, and provide testimony on the report if requested. The Commission also shall establish a website and a toll-free number as a one-stop-shop for all federal financial literacy programs.

It is recognized that the federal government has many different financial literacy programs and partnerships spanning a broad array of topics which are targeted at different types of consumers. Many of these programs are extremely beneficial to consumers, however, many consumers are unaware that the programs or educational information exist. The purpose of this Title is not to require the Commission to rebuild all existing federal financial literacy and education programs. The Commission ought to use existing materials, programs and partnerships as appropriate and create new materials, programs, and partnerships as needed. This Title is also intended to provide consumers with one access point for all of the programs and partnerships. The Commission is modeled on the Trade Promotion Coordinating Committee and it is intended that the Commission operate and be administered generally in a similar manner.

The toll-free number shall be operated in a similar manner to the toll-free number operated by the Small Business Administration for small businesses in that consumers will be sent relevant pamphlets or other such information on their financial literacy requests or be directed to the appropriate federal agency with overall expertise in their area of interest. The toll-free number will not provide any financial planning advice regarding a consumer's specific personal financial situation nor make any specific recommendation regarding private sector financial products or services.

*Section 515. Powers of the Commission*

This section authorizes the Commission to hold hearings and receive testimony as necessary to carry out the Title, to receive information directly from any Federal department or agency, and to undertake periodic studies regarding the state of financial literacy.

*Section 516. Commission personnel matters*

This section states that members of the Commission shall serve without compensation in addition to that received for their primary duties, however, the Commission may pay for travel expenses of members for official duties of the Commission. In addition, the Director of the Office of Financial Education of the Treasury Department shall provide assistance to the Commission. The section also permits federal employees to be detailed to the Commission.

25

*Section 517. Study by the Comptroller General*

This section mandates that the Comptroller General of GAO shall submit a report to Congress not less than three years after enactment on the effectiveness of the Commission.

*Section 518. Authorization of appropriations*

This section authorizes appropriations to the Commission as may be necessary to carry out the mission of the Title, including administrative expenses.

## TITLE VI—RELATION TO STATE LAW

This section amends Sections 625(d) and eliminates the January 1, 2004 sunset provision contained in current law.

## TITLE VII—MISCELLANEOUS

*Section 711. Clerical amendments*

### REGULATORY IMPACT STATEMENT

In accordance with paragraph 11(b), rule XXVI, of the Standing Rules of the Senate, the Committee makes the following statement concerning the regulatory impact of the bill.

"The National Credit Reporting System Improvement Act of 2003" modifies the FCRA to address changes which have occurred in the credit markets in the last seven years. This legislation enhances the ability of consumers to combat identity theft, increases accuracy by providing consumers greater notice about, and access to, their credit report information, and allows consumers to exercise greater control regarding the type and amount of marketing solicitations they receive. Additionally, the bill restricts the use and transfer of sensitive medical information. Lastly, it employs targeted measures to address the significant issue regarding the level of financial literacy in the United States.

By affording consumers greater access and control of their credit report information and by providing them with greater opportunities to control how such information can be used, this legislation should have significant positive impact on the privacy of individuals.

Currently, there are about 600 consumer reporting agencies, 30,000 furnishers, and an unlimited number of potential consumer report users whose activities are governed by the FCRA. The changes made by this legislation do not expand the FCRA to cover new or different types of entities.

The legislation establishes permanent, uniform, national standards. The legislation also requires the Federal banking regulators and the Federal Trade Commission to develop and prescribe regulations with respect to identity theft prevention and to develop and prescribe regulations to ensure the accuracy and completeness of information furnished to the credit reporting system. Because the legislation provides uniform national standards, allowing for the further development of national credit markets and reduces the opportunities for identity theft, inaccuracy, and increases consumer awareness and understanding of the financial markets, the legislation will achieve greater efficiencies in the credit markets. The combination of national standards and greater efficiency will lead

26

to greater availability of credit that is more cheaply and quickly accessible. Ultimately, the new legal and regulatory framework established by this legislation will provide significant benefits to millions of American consumers and the national economy.

COST OF THE LEGISLATION

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, September 29, 2003.*

Hon. RICHARD C. SHELBY,
*Chairman, Committee on Banking, Housing, and Urban Affairs,*
*U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the enclosed cost estimate for the National Consumer Credit Reporting System Improvement Act of 2003.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is Susanne S. Mehlman.

Sincerely,

ELIZABETH M. ROBINSON
(For Douglas Holtz-Eakin, Director).

Enclosure.

*National Consumer Credit Reporting System Improvement Act of 2003*

Summary: CBO estimates that implementing this legislation would cost about $13 million over the next five years, assuming appropriation of the necessary amounts. We also estimate that enacting this legislation would reduce revenues by $4 million over the next five years. The bill also could affect direct spending, but CBO estimates that any such impact would not be significant.

This legislation would provide new consumer protections against identity theft (that is, fraud committed using another person's identifying information) and would permanently extend the provisions in the Fair Credit Reporting Act (FCRA) that prevent states from imposing new restrictions on how financial institutions share consumer information. In 1996, FCRA was amended to create a uniform national standard for consumer protections governing credit transactions, but that standard is scheduled to expire on January 1, 2004. The bill also would give consumers access to certain financial records, help ensure the accuracy of credit reports, enable consumers to "opt-out" of receiving certain commercial solicitations, and provide protection of consumers' medical information.

The National Consumer Credit Systems Improvement Act contains an intergovernmental mandate as defined in the Unfunded Mandates Reform Act (UMRA), but CBO estimates that the costs would not exceed the threshold established in UMRA ($59 million in 2003 adjusted annually for inflation).

The bill would impose several private-sector mandates, as defined in UMRA, on consumer reporting agencies, individuals and businesses that print electronic credit card receipts, mortgage lenders, credit and debit card issuers, debt collection agencies, and certain companies affiliated by corporate control. CBO expects that the direct costs of those mandates would exceed the annual threshold for private-sector mandates ($117 million in 2003, adjusted an-

27

nually for inflation) in at least one of the first five years the man-dates are in effect.

Estimated cost to the Federal Government: The estimated budg-etary impact of this bill is shown in the following table. The costs of this legislation fall within budget functions 370 (commerce and housing credit) and 800 (general government). For this estimate, CBO assumes that bill will be enacted in the fall of 2003 and that spending will follow historical rates for similar activities.

| | By fiscal year, in millions of dollars— | | | | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 |
| **CHANGES IN SPENDING SUBJECT TO APPROPRIATION** | | | | | |
| FTC activities: | | | | | |
| Estimated authorization level .................................................. | 5 | 3 | * | * | * |
| Estimated outlays ..................................................................... | 4 | 3 | 1 | * | * |
| Financial Literacy and Education Commission: | | | | | |
| Estimated authorization level .................................................. | 1 | 2 | 2 | 0 | 0 |
| Estimated outlays ..................................................................... | 1 | 2 | 2 | 0 | 0 |
| Total proposed changes: | | | | | |
| Estimated authorization level .................................................. | 6 | 5 | 2 | * | * |
| Estimated outlays ..................................................................... | 6 | 5 | 2 | * | * |
| **CHANGES IN REVENUES** | | | | | |
| Estimated revenues ........................................................................ | –2 | 0 | –1 | 0 | –1 |

Notes.—FTC=Federal Trade Commission; *=less than $500,000.

Basis of estimate: CBO estimates that implementing this legisla-tion would cost about $13 million over the next five years, assum-ing appropriation of the necessary amounts. We also estimate that enacting this legislation would reduce revenues by $4 million over the next five years. The bill could affect direct spending, but CBO estimates that any such impact would not be significant.

The bill would require the Federal Trade Commission (FTC) to prepare a model summary of rights for consumers who believe that they may be the victims of fraud or identity theft and for con-sumers who want to obtain or dispute information contained in consumer reports. The FTC also would be responsible for devel-oping procedures and forms for consumers to use when reporting identity theft to creditors and credit-reporting agencies, for imple-menting a public education campaign on the prevention of identity theft, for conducting various studies on consumer credit and how to improve the operation of FCRA, and developing guidelines and regulations regarding identity theft and credit reporting. Finally, the legislation would require the FTC to compile consumer com-plaints about incomplete or inaccurate information in their credit file and submit those complaints to each reporting agency involved with the file.

The bill would require the federal banking agencies—which in-cludes the Office of the Comptroller of the Currency (OGC), the Federal Deposit Insurance Corporation (FDIC), the Office of Thrift Supervision (OTS), and the Board of Governors of the Federal Re-serve System (the Federal Reserve)—and the National Credit Union Administration (NCUA) to issue various guidelines and reg-ulations concerning identity theft, credit reporting, and use of con-sumers' medical information by financial institutions and to produce studies on information sharing practices by financial insti-tutions. Finally, this legislation would require the Federal Reserve to conduct ongoing audits of information contained in consumer re-

28

ports prepared or maintained by consumer reporting agencies to ensure that such information is accurate and complete. In addition, every two years the Federal Reserve would be required to submit a report of their findings to the Congress.

The bill also would establish the Financial Literacy and Education Commission to improve public awareness of financial matters, including the availability and significance of credit reports and credit scores. The Secretary of the Treasury would serve as the Chairperson of this commission, which would be composed of the respective heads of each federal banking agency and the NCUA as well as representatives from various other agencies.

*Spending subject to appropriation*

Based on information from the FTC, CBO estimates that the studies, public education campaigns, guidelines, and regulations required under this legislation would cost that agency $4 million in 2004 and $8 million over the 2004–2008 period, assuming appropriation of the necessary amounts.

Based on information from the Treasury, CBO estimates that the Financial Literacy and Education Commission would cost about $5 million over the next three years, subject to the availability of appropriated funds. Such funding would cover personnel and administrative costs and costs associated with establishing and maintaining a Web site and a toll-free number. In addition, this legislation would require the General Accounting Office (GAO) to assess the effectiveness of the Financial Literacy and Education Commission no later than three years after the enactment of this legislation. CBO estimates that the GAO study required under the bill would cost less than $500,000.

*Direct spending and revenues*

The NCUA, the OTS, and the OCC charge fees to cover all their administrative costs; therefore, any additional spending by those agencies to implement the bill would have no net budgetary effect. That is not the case with FDIC, however, which uses deposit insurance premiums paid by banks to cover the expenses it incurs to supervise state-chartered institutions. (Under current law, CBO estimates that the vast majority of thrift institutions insured by the FDIC would not pay any premiums for most of the 2004–2013 period.) The bill would cause a small increase in FDIC spending but would not affect its premium income. Based on information from the FDIC, implementing the bill would have a minor impact on the agency's workload.

CBO estimates that the Federal Reserve's costs associated with the rulemaking and studies required under the bill would be minimal. However, the audits and related reports specified under the bill would require the Federal Reserve to purchase additional data from credit bureaus to develop new software and models, and conduct in-person interviews with consumers. Based on information from the Board of Governors, CBO estimates that complying with the requirements of the bill would increase the Federal Reserve's expenses by $2 million in 2004, by $4 million over the 2004–2008 period, and by $8 million over the 2004–2013 period. The Federal Reserve remits its net income to the Treasury, and those payments are classified as governmental receipts, or revenues, in the federal

29

budget. Therefore, increasing the Federal Reserve's costs by the aforementioned amounts would result in an equal reduction in federal revenues.

Estimated impact on state, local, and tribal governments: The bill would permanently prohibit state and local governments from enacting laws that are different from the Fair Credit Reporting Act in certain specified cases. Such a preemption of state law is an intergovernmental mandate as defined in UMRA, but CBO estimates that would not impose significant costs on state and local governments. Therefore, the cost of the preemption would not exceed the threshold established in UMRA ($59 million in 2003, adjusted annually for inflation).

Estimated impact on the private sector: The bill would impose several private-sector manadates as defined in UMRA on consumer reporting agencies, individuals and businesses that print electronic credit card receipts, mortgage lenders, credit and debit card issuers, debt collection agencies, and certain companies affiliated by corporate control by:
- Requiring free credit reports upon the request of an individual;
- Requiring truncation of credit card account numbers on receipts printed electronically;
- Requiring disclosure of credit scores when approving certain loans;
- Requiring certain fraud alerts and blocks in consumer credit files; and
- Requiring additional notifications and disclosures to consumers.

CBO expects the aggregate direct costs of the private-sector mandates in the bill would exceed the annual threshold established by UMRA ($117 million in 2003, adjusted annually for inflation) in at least one of the first five years the mandates are in effect.

*Consumer access to credit reports*

Section 211 would require consumer reporting agegncies to provide an annual free credit report within 15 days from the date of a request from an individual by mail or through an Internet Web site. Based on information from industry and government sources, CBO assumes a threefold increase in the number of individuals requesting a free credit report each year. CBO estimates that the additional direct cost to consumer reporting agencies for providing mandatory free credit reports would be $1.00 to $2.00 per report with a total cost ranging from $30 million to $60 million per year.

*Truncation of credit card account numbers*

Section 113 would impose a private-sector mandate by requiring individuals and businesses that accept credit cards or debit cards to truncate the card account numbers by including no more than the last five numbers on an electronically printed cardholder receipt. The mandate would take effect three years from the date of enactment for machines currently in use and beginning in 2006 for machines first put into service after January 1, 2005. According to the credit card processing industry, some systems are currently in compliance because they are capable of electronically printing trun-

30

cated account numbers on customer receipts. To comply with this mandate, some merchants would have to make modifications to their systems, including software reprogramming, formatting changes to dial-up terminals, and purchase of new printing devices. Costs to replace machines would range from $300 to $1,000 per unit. Assuming merchants would have to replace 25 percent of the currently used machines in 2007, the cost to replace such machines, including programming modifications, would amount to at least $85 million in that year.

*Disclosure of consumer credit score*

Section 212 would require mortgage lenders or anyone that extends credit for consumer purposes secured by a dwelling and uses a consumer credit score for approval of such credit to provide a copy of the credit score and associated information received from a consumer reporting agency or third party to an applicant as soon as reasonably practicable. Based on approximately 13 million annual mortgage loan applications affected by this provision, and handling and mailing costs provided by the industry, CBO expects that the direct cost to provide such information would range from $35 million to $55 million per year.

*Fraud alert in credit file*

Section 112 would require consumer reporting agencies to include a fraud alert in the file of a consumer and disclose to the consumer that they may request a free copy of the file when the agency receives a direct request that a consumer has been or is about to become a victim of fraud, including identity theft. A consumer reporting agency would also be required to include an active-duty alert in the file of an active-duty military consumer upon their request. In addition, section 152 would require consumer reporting agencies to block any information in the file of a consumer that the consumer identifies as resulting from an alleged identity theft and confirms with a police report. An agency also would be required to notify the furnisher of the information identified by the consumer of certain information regarding such a block. According to the consumer reporting industry and government sources, the national consumer reporting agencies generally provide such alerts and blocks voluntarily. Therefore, CBO estimates that the direct cost to comply with those mandates would not be significant.

Other provisions of the bill addressing fraud alert coverage would impose private-sector mandates as follows:

• Require credit reporting agencies to coordinate consumer complaint investigations by developing and maintaining procedures for the referral to other credit reporting agencies any consumer complaint alleging identity theft or requesting a fraud alert or block; and

• Require a debt collection agency that learns information in a consumer report is the result of identity theft or otherwise is fraudulent to notify the furnisher of the information or the relevant consumer reporting agency that the information is fraudulent.

Based on information from various industry and government sources, CBO expects the direct cost to comply with those man-

31

dates would be small compared with the costs of the three most costly mandates in the bill.

*Other notification and disclosure requirements*

In addition, the bill would impose other private-sector mandates as follows:

    • Require a consumer reporting agency that receives a request for a consumer report using an address substantially different from the addresses in the consumer's file to notify the requester of the existence of the discrepancy;

    • Require credit reporting agencies to provide certain information, including a summary of rights to be prepared by the Federal Trade Commission, with each written disclosure sent to a consumer;

    • Require credit and debit card issuers that receive a request for additional or replacement cards on an existing account within a short period of time after receiving a change of address form to notify the cardholder at the former address or use other means to confirm the address change; and

    • Prohibit a consumer reporting agency from providing credit reports that contain medical information with some exceptions and would require medical companies to identify themselves as such when reporting credit information.

According to industry sources, many entities currently comply with such requirements voluntarily; and therefore, the direct cost to comply with those mandates would not be significant.

The bill also would require companies affiliated by corporate control that share information with affiliates for the purpose of making certain solicitations for marketing purposes to give consumers notice of such sharing and provide consumers the opportunity to prohibit or modify such solicitations. Based on information from various industry and government sources, CBO expects the direct cost to the private sector would be small compared with the costs of the three major mandates in the bill.

Previous CBO estimate: On September 3, 2003, CBO transmitted a cost estimate for H.R. 2622, the Fair and Accurate Credit Transactions Act of 2003, as ordered reported by the House Committee on Financial Services on July 24, 2003. CBO estimates that enacting H.R. 2622 would cost about $7 million over the next five years and any impact on direct spending and revenues would be insignificant. The National Consumer Credit Systems Improvement Act would preempt state law in the same way as H.R. 2622, and CBO estimates that the two bills would have an identical impact on state and local governments. H.R. 2622 contains most of the same private-sector mandates as this Senate bill, including mandates requiring consumer access to credit reports, truncation of credit card numbers, disclosure of credit scores and fraud alerts in consumer credit files. CBO estimates that the direct costs of those mandates would exceed the annual threshold for private-sector mandates in at least one of the first five years the mandates are in effect.

Estimate prepared by: Federal Costs: Susanne Mehlman and Melissa Zimmerman. Federal Revenues: Annabelle Bartsch. Impact on State, Local, and Tribal Governments: Sarah Puro. Impact on the Private Sector: Paige Piper/Bach.

32

Estimate approved by: Peter H. Fontaine, Deputy Assistant Director for Budget Analysis; and G. Thomas Woodward, Assistant Director for Tax Analysis.

CHANGES IN EXISTING LAW (CORDON RULE)

On September 23, 2003, the Committee unanimously approved a motion by Senator Shelby to waive the Cordon rule. Thus, in the opinion of the Committee, it is necessary to dispense with the requirement of section 12 of rule XXVI of the Standing Rules of the Senate in order to expedite the business of the Senate.

○